USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  03/31/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KATE S. CROWLEY,

                              Plaintiff,

            v.

JEH C. JOHNSON, *Secretary, United States Department of Homeland Security*,

                              Defendant.

No. 13-CV-1634 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Kate S. Crowley brings this action against Defendant Jeh C. Johnson[1] in his capacity as Secretary of the Department of Homeland Security, alleging that her former employer, the United States Secret Service, discriminated against her because she is female and then retaliated against her for complaining about that discrimination, thus violating Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq..  Specifically, Plaintiff alleges discrimination and retaliation in the assignment of overtime, midnight shifts, weekend work, and travel. Defendant now moves for summary judgment on the basis that Plaintiff has failed to establish a prima facie case of discrimination or retaliation under Title VII.  For the reasons that follow, the Court agrees and, accordingly, Defendant's motion is GRANTED.

---

[1] Plaintiff originally named Janet A. Napolitano, then Secretary of Homeland Security, as Defendant.  Her successor, Jeh C. Johnson, is automatically substituted as a defendant by operation of Fed. R. Civ. P. 25(d).  The Clerk of Court is directed to correct the caption accordingly.

# I.   BACKGROUND[2]

## A.   Overview

Since September 2000, Plaintiff has been employed as a special agent ("SA") with the United States Secret Service, which is an agency within the Department of Homeland Security ("DHS").  From November 2006 through December 2010, Plaintiff was assigned to the Clinton Protective Division, or "WCD," which is tasked with protecting former President William J. Clinton and former Secretary of State Hillary Rodham Clinton.  Plaintiff's claim here concerns solely the period between January and December 2010, when she was assigned to the protective detail for President Clinton.  At that time, she was one of four female agents out of over 40 agents on the WCD, and the only female shift leader.  (Morrison Aff. ¶ 3; Crowley Aff. ¶ 3.)

As Plaintiff has explained, "after a couple of months [after returning to the detail], I felt that I was not and I noticed that I was not getting the overtime and trips that my co-workers were getting."  (Crowley Dep. 46:16–18.)  The co-workers she had in mind were all men.  Plaintiff inferred the difference in treatment was based on her gender "[b]ecause I was the only female in a leadership position on the detail and I was treated differently."  (Crowley Dep. 162:3–5.)  She further explained:

> I think that they were taking care of the guys that they were friendly with.  The guys.  That's all I can say.  I can't explain why I wasn't given the same schedule as them.  The other eight whips or shift leaders are men. I don't know.   …   I wasn't one of the guys.  If I could say that.  I didn't hangout with them in the off time like they did.  I wasn't part of their cli[que] … I was friendly with them, but I wasn't one of the guys that they go out and socialize and do the other things with.  They were all buddies together.

(Crowley Dep. 94:23–95:3, 95:9–11, 95:15–17.)

---

[2] Unless otherwise noted, the relevant facts are drawn from the parties' Local Rule 56.1 statements (Dkt. 44, 63, 59) and are undisputed.

To address what she perceived as a lack of fairness, Plaintiff spoke up. The situation, however, "did not get any better." (Crowley Dep. 47:4.) Indeed, in time it became worse—"really horrendous," in her words. (Crowley Dep. 47:9.) More specifically, Plaintiff asserts she was given less (and then significantly more) overtime than her male colleagues, that she was given fewer weekends than them, that she was given more midnight shifts than them, and that she was given worse travel assignments than them—in each case, because she is female. This action eventually followed.

**B.      Plaintiff's Employment at the Secret Service**

Plaintiff's detail within the WCD is based primarily in Chappaqua, N.Y., although its members also travel with the Clintons. The WCD is supervised by a special agent in charge ("SAIC"), assisted by one deputy special agent in charge ("DSAIC") and several assistant agents in charge ("ASAIC"). All agents assigned to protective operations are divided into three shifts—A, B, and C—with each shift consisting of one shift leader, two "whips," and multiple agents. Together, the three shifts of agents fulfill the WCD's mission of providing around-the-clock protection to President and Secretary Clinton wherever they are.

Weekly work schedules for agents providing protection to the Clintons are overseen by a shift leader assigned to the WCD's Operations section ("OPS"). In preparing the schedules, the OPS team considers agent availability, including scheduled days off; coordinates overtime among the various agents; assigns agents to day, evening, or midnight shifts; and makes preliminary travel assignments. The main consideration in making these decisions is ensuring that each shift is fully staffed to ensure that the WCD is able to fulfill its protection mandate. The schedule is set each Friday for the week beginning Sunday after being reviewed by the OPS shift leader, an ASAIC, and either the SAIC or DSAIC. It is subject to modification depending on the changes to President

and Secretary Clinton's commitments and travel schedules.  When Plaintiff joined the WCD, and throughout her time on the detail, she "absolutely" expected her schedule to be unpredictable. (Crowley Dep. 41:11–17.)

The OPS shift leader has discretion in the way each week's schedule is prepared.  He is not expected to arrive at a complete schedule in any particular way, and no rules, regulations or policies speak specifically to how he must create a schedule.  Plaintiff, who served as OPS shift leader before becoming the C shift leader, explained that "we didn't have like a binder in there, that you were sitting there going, this is how everything is done."  (Crowley Dep. 29:3–4.)  Rather, "each agent does Operations differently" and agents had "discretion, absolutely."  (Crowley Dep. 27:24–25, 29:9; see also Burr Dep. 20:5–6; McAleer Dep. 41:21–22, 42:3–8, 42:13–14.)  She testified that she was trained on-the-job to look at a variety of factors and "to make sure that everyone's treated fairly, that all the shifts are covered."  (Crowley Dep. 28:14–16.)  Plaintiff explained that she considered "who had certain trips, who hadn't, who was due for trips, seniority. Those type of issues."  (Crowley Dep. 27:25–28:3.)  In one agent's opinion, however, it was "well known" among the WCD agents that OPS agents "often assigned their favored shift agents the more desirable travel assignments."  (Morrison Aff. ¶ 6.)

There is no guaranteed minimum amount of overtime hours on the WCD, nor are agents guaranteed any particular travel schedule.  (Crowley Dep. 34:11–13.)  That said, in creating the schedule, individual agents' preferences, such as a desire for more overtime or particular travel preferences, are considered.  When agents do make particular requests, those requests are often accommodated, provided they do not affect the WCD's protective mission.  SA Jeffrey Burr, who succeeded Plaintiff as OPS shift leader in January 2010 and served in that capacity for the bulk of the period relevant to this case, explained that if an agent asked, for example, to be part of the

detail on a scheduled trip to Minnesota because the agent's family was from Minnesota, he would consider that request in creating the schedule. "When it was possible, you would try to make those requests happen. Sometimes you could and sometimes you couldn't." (Burr Dep. 50:13–15.)

Agents are entitled to two scheduled days off every seven days. There is no expectation that agents' scheduled days off will be consecutive or fall on a weekend. During the summer, agents on the WCD tend to work more weekends because there are fewer agents available due to scheduled vacations. Where agents needed an assurance that they would not be scheduled on a particular day or shift, they could use annual or sick leave. Requested Days Off ("RDOs") could also be used, but were not guaranteed.[3]

From January through December 2010—the period that gave rise to this action—Plaintiff served as the C shift leader with the WCD. Previously, she had served as the shift leader in OPS from July 2009 through January 2010. In her role as C shift leader, Plaintiff was assisted by two whips. Although a shift leader is senior to a whip, for scheduling purposes, a shift leader and a whip are interchangeable positions. Each shift is required to have either a shift leader or a whip assigned at all times.

In the relevant period, Sean Gallagher served as SAIC through approximately August 2010 and Willie Dinkins served as DSAIC until approximately August 2010, when he became Acting SAIC. Greg McAleer and David Watson were two of the three ASAICs. SA Burr, as noted, succeeded Plaintiff as OPS shift leader in January 2010 and served in that role through October 9, 2010, when he was succeeded by SA Marc Leshnower, who was OPS shift leader through the end

---

[3] The parties' 56.1 statements appear to treat RDOs as guaranteed. (See Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.) However, Plaintiff's own deposition suggests that they are not: "Now, a requested day off means you requested the day off. That's not a guarantee that you are going to get the day off, which obviously caused some problems with certain agents that sometime I had to take away their requested day off." (Crowley Dep. 40:9–13; see also Bertrand Decl., Ex. G at 6.)

of the relevant period.  For seniority purposes, the OPS shift leader and the shift leaders on the A, B, and C shifts are considered peers.  That is, an OPS shift leader does not supervise the other shift leaders.

### C.   Plaintiff Raises Her Concerns

In mid-May 2010, while on a flight to West Virginia, Plaintiff asked ASAIC Watson for advice about how to voice her dissatisfaction with the assignments she had been given.  Specifically, Plaintiff believed that her male colleagues were getting "more desirable travel assignments," which included "danger pay" and higher per diems, "in addition to earning more overtime." (Crowley Aff. ¶ 6.)  Knowing that this was her final year on the WCD before she relocated to Rhode Island, where she planned to purchase a house, the opportunity to earn the extra money was "substantially important to fulfilling the financial needs of [her] relocation."  (Id. ¶ 7.)  As Plaintiff explained of why she spoke with ASAIC Watson, "I wanted his advice on how to proceed." (Crowley Dep. 78:6–8.)  The fact that they were flying together to West Virginia was notable to her.  "I said, why am I going to West Virginia and someone else is going to—I think the trip was to S[an] Antonio and somewhere out West."[4]  (Crowley Dep. 77:15–19.)  At that point in the year, Plaintiff had traveled to Boston, Mass.; Davos, Switzerland; Orlando, Fl.; Little Rock, Ark.; Saudi Arabia; and Philadelphia, Pa.

Thereafter, in mid- or late May 2010, Plaintiff spoke to ASAIC McAleer and SA Burr to request additional overtime and more travel.  Having recently left her position in OPS, where

---

[4] On this point, Plaintiff's account conflicts with the record supplied by Defendant, which Plaintiff has not disputed.  (See Pessia Aff., Ex. 5.)  Because neither party has brought this discrepancy to the Court's attention, for present purposes, the Court accepts Plaintiff's account, but notes that she may have confused a trip to Little Rock— her only trip in May—with her trip to West Virginia, which Defendant's record shows happened in July.  In any event, where Plaintiff was flying to when she raised her concerns with ASAIC Watson is immaterial.  The record does clearly show that other shift leaders traveled to San Antonio and "out West" in May—namely, to Albuquerque, Phoenix, Las Vegas, Calgary, and Vancouver.

agents did not normally make overtime, Plaintiff explained to SA Burr, who oversaw scheduling in his capacity as OPS shift leader, that she now "wanted to make some overtime because I didn't make any overtime for six months in 2009." (Crowley Dep. 84:11–13; see also Crowley Aff. ¶ 8 ("I addressed my concerns and made it clear that I wanted to receive as much [overtime] as the other special agents.").) She also asked if she could be assigned on any upcoming trips to Las Vegas and Haiti. (Burr Dep. 64:20–65:16; Dinkins Dep.44:9–10; Crowley Dep. 84:17.) In these conversations, Plaintiff did not say that she felt that she was being treated differently than her male colleagues because of her gender. (See Crowley Dep. 79:4–8 ("I didn't say, I'm a female, why is my schedule different? I said, I don't know why I'm not getting the same type of trip.").) Nor does Plaintiff recall the conversations as being acrimonious. (See Crowley Dep. 85:4–6 ("It wasn't a difficult conversation. It was a pleasant conversation, to the best of my recollection.").)

From May 23, shortly after her conversation with SA Burr, through June 19, Plaintiff believes she was "overloaded" with overtime, working 65.75 hours, "over 50 hours of which were between May 23 and June 6." (Crowley Aff. ¶ 9.) In roughly the same period, Plaintiff was assigned to trips to Arkansas, the Dominican Republic, Peru, and Colombia. These trips also afforded her additional overtime. On one of those trips in early June, while Plaintiff was flying on a private plane with President Clinton, a Clinton staffer approached SAIC Gallagher and asked him why Plaintiff was working excessively over the prior two weeks. (Crowley Aff. ¶ 10.) When SAIC Gallagher asked Plaintiff about the situation, she advised him that she "had been working extensively over the past two weeks, which [she] had asked for, the overtime." (Crowley Dep. 90:23–25.) That started a conversation about Plaintiff's concerns with her schedule.

On June 16, a meeting of the WCD ASAICs and shift leaders was held. At that meeting, Plaintiff stated that she and other agents had concerns with the schedule, specifically with overtime

and travel, and she identified another male agent, Justin Hanson, as having similar concerns.  Plaintiff worked over the prior weekend to prepare charts of the schedule to illustrate the alleged disparities in overtime and travel.  (Crowley Dep. 104:18–21; 113:20–22.)  Again, she did not assert her apparent belief that the alleged disparity in the schedules was the result of discrimination.  (See Crowley Dep. 114:5–7 ("I'm a female on a job where it's predominantly men. I did not say, this is sexism, no.").  In Plaintiff's view, the meeting did not go well.  On the contrary, she felt that "it was obvious [she] was being ganged up on" by the other shift leaders and whips, such that ASAIC Watson intervened.  (Crowley Dep. 109:20–22.)  After that meeting, on July 10, Plaintiff received a call from SA Burr.  He was "incredibly angry" and chastised Plaintiff for "causing problems" because "there was nothing wrong with the schedules."  (Crowley Aff. ¶ 15; see also Crowley Dep. 103:11, 103:17–18 (describing SA Burr as "obviously irate" and "incredibly hostile" on the call).)

Around 2 p.m. on August 4, Plaintiff received an email from SA Burr directing her to report for duty at 9 p.m. the same day.  (Crowley Dep. 120:19–121:5.)  She understood that the President's schedule had changed and that SA Rob Karl, who was scheduled to work a midnight shift that evening, was being sent to Haiti.  (Crowley Dep. 121:5–12.)  Plaintiff had worked the previous midnight shift, and seven such shifts before, and was out shopping during the day so she could transition to a normal sleeping schedule of sleeping overnight.  (Crowley Dep. 121:13–23.)  She immediately called SA Burr to explain that she hadn't slept since her last shift, and that she would not be coming in because it would be "unsafe."  (Crowley Dep. 121:24–122:10; Crowley Aff. ¶ 20.)  SA Burr appeared "furious" at Plaintiff's refusal.  (Crowley Dep. 122:4.)  When ASAIC McAleer and Plaintiff spoke later and he asked her to come in, Plaintiff again said she could not work that night.  (Crowley Dep. 122:12–17.)  Ultimately, another SA covered for Plaintiff.  At a

meeting the next week with SAIC Dinkins and ASAIC McAleer, ASAIC McAleer asked Plaintiff, "I don't know what the problem is, you just worked eight midnights, you are already on that schedule, why can't you come in and work?"  (Crowley Dep. 123:7–10.)  She reiterated that she had not slept after her last shift and would have been unable to "sleep adequately" before the shift she had been asked to cover.  (Crowley Dep. 123:10–13.)

On October 8, Plaintiff emailed ASAIC McAleer stating that she would like a weekend off because she was facing her "twelfth consecutive working weekend in a row" while "[a]ll the other [shift leaders] and Whips have had a [full] weekend off within the past six weeks."  (Schoenberger Aff., Ex. F.)  Specifically, between July 31 and October 10, Plaintiff worked without a consecutive Saturday and Sunday off.  She had not requested an RDO in that time.  After some back and forth via emial, ASAIC McAleer replied to Plaintiff's message: "OPS has reshuffled and accommodated your request.  Thanks for bringing it to my attention."  (Schoenberger Aff., Ex. F.)

Earlier, in mid-August, Plaintiff had first contacted the DHS Equal Employment Opportunity ("EEO") Office informally and she sought EEO counseling on September 30.  Her formal EEO complaint was filed on December 15, four days after she stopped working at the WCD.  This matter was commenced on June 15, 2012 in the United States District Court for the District of Columbia.  On January 14, 2013, Defendant filed a motion to transfer and, on March 12, 2013, this action was transferred to the Court.  Following discovery, Defendant filed the instant motion.

## II.   LEGAL STANDARD

A court shall grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see generally Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "The substantive law governing the case will identify those facts that are material, and only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry of summary judgment." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). A dispute is "genuine" for purposes of summary judgment "where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." Id. (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). There are numerous ways the moving party—Defendant here—can meet this burden, including, for example, by "establish[ing] that plaintiffs are unable to prove at least one of the essential elements of their claims." In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 758 F.3d 202, 210 (2d Cir. 2014) (quotation marks and citations omitted). Thus, where the non-moving party bears the burden of proof on an issue, as Plaintiff does here with respect to establishing a prima facie case under Title VII, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), Defendant can secure judgment by "point[ing] to an absence of evidence to support an essential element of the nonmoving party's claim," Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322–23). In such circumstances, Plaintiff "cannot defeat the motion by rely-ing on the allegations in [her] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Rather, Plaintiff can demonstrate a genuine issue of material fact only by advancing specific evidence sufficient to permit a reasonable factfinder to decide in her favor. See Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003).

10

In the Title VII context, as Plaintiff has rightly noted, courts are "particularly cautious about granting summary judgment to an employer … when the employer's intent is in question." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotations omitted).  "Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"  Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

Nonetheless, a Title VII plaintiff "is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind."  Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).  Indeed, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001); see also McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994) ("[The] impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.").  "[T]he salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to ... other areas of litigation."  Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

In sum, although courts will grant summary judgment "sparingly" in the Title VII context, in order to resist a properly-supported motion for summary judgment, the non-moving party is not relieved of her burden to offer "such proof as would allow a reasonable juror to return a verdict in [her] favor."  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).  "[W]hen that proof is slight," summary judgment is appropriate.  Id.

### III.   DISCUSSION

**A.       Plaintiff's Claim of Discrimination**

#### 1.        Legal Framework

Title VII of the Civil Rights Act of 1964 forbids an employer from "discriminat[ing] against any individual with respect to … terms, conditions, or privileges of employment, because of such individual's … sex."  42 U.S.C. § 2000e–2(a)(1); <u>see also</u> § 2000–e16 (extending Title VII protection to certain federal government employees).  That language is understood to prohibit both intentional discrimination (known as "disparate treatment") and practices that while not intentionally discriminatory have a disproportionately adverse effect on a protected class (known as "disparate impact").  <u>See</u> <u>Ricci v. DeStefano</u>, 557 U.S. 557, 577 (2009).  Plaintiff's claim here is one of disparate treatment.  (<u>See</u> Plf. Mem. 8, 13.)

Disparate treatment is "the most easily understood type of discrimination"—and "the most obvious evil Congress had in mind when it enacted Title VII"—because an "employer simply treats some people less favorably" on the basis of a protected trait.  <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 335 n. 15 (1977).  That is, "liability in a disparate-treatment case depends on whether the protected trait actually motivated the employer's decision."  <u>Young v. United Parcel Serv., Inc.</u>, ___ U.S. ___, No. 12-1226, 2015 WL 1310745, at *5 (U.S. Mar. 25, 2015) (alteration and internal quotation marks omitted).  Because "[p]roof of discriminatory motive is critical," <u>Teamsters</u>, 431 U.S. at 335 n. 15, disparate treatment claims face "a fundamental difficulty with enforcement: the legality or illegality of the employer's … action comes to hinge on its intent or state of mind," 3 N. Peter Lareau, <u>Labor and Employment Law</u> § 51.01 (Matthew Bender 2015).

A disparate-treatment plaintiff may prove her case "either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in McDonnell Douglas." Young, 2015 WL 1310745, at *5. "Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove [her] claim by direct evidence, and is usually constrained to rely on circumstantial evidence." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). In other words, most plaintiffs rely on the McDonnell Douglas framework, as Plaintiff does here. (See Plf. Mem. 8.)

Under the first of McDonnell Douglas's three steps, "the plaintiff must establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). This burden is "not onerous," Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981), but rather, as courts have repeatedly cautioned, "minimal," St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993), "de minimis," Abdu–Brisson, 239 F.3d at 467, and "light," Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996). Nonetheless, the effect of establishing a prima facie case is powerful because the law accepts that a plaintiff who has done so has "eliminate[d] the most common nondiscriminatory reasons for [an adverse employment action]." Burdine, 450 U.S. at 253–54.[5]

That is where the latter two stages of McDonnell Douglas come in. At the second stage, "[e]ven if the plaintiff succeeds in presenting a prima facie case, the defendant may rebut that

---

[5] Thus "[i]f the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Burdine, 450 U.S. at 254.

showing by articulating a legitimate, non-discriminatory reason for the employment action." Weinstock, 224 F.3d at 42. Significantly, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." Burdine, 450 U.S. at 254. Rather, "[i]t is sufficient [that] the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id.

If the defendant succeeds in rebutting plaintiff's prima facie case, the inquiry proceeds to the third stage and "a new level of specificity," where the plaintiff's burden "now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Id. at 255–56. At this third step, "the plaintiff must … come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Weinstock, 224 F.3d at 42. Pretext may be demonstrated either by the presentation of additional evidence showing that "the employer's proffered explanation is unworthy of credence," Burdine, 450 U.S. at 256, or by reliance on the evidence comprising the prima facie case, without more, see Hicks, 509 U.S. at 511.

Whatever the plaintiff chooses to do at the ultimate stage, she "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the adverse employment action." Weinstock, 224 F.3d at 42 (quotation marks, citations, and alterations omitted). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." Id.

### 2. Issues Before the Court

#### a) *Adverse Employment Action and Inference of Discrimination*

Here, the dispute between the parties focuses on whether Plaintiff has met her prima facie burden and, specifically, whether she has shown sufficient evidence to ground an adverse employment action (the third element) and circumstances that permit an inference of discrimination (the fourth element). Defendant asserts in moving for summary judgment that there is no evidence to support Plaintiff's claim that the imposition of her schedule—with respect to her overtime, weekends, midnight shifts, and travel—constituted an adverse employment action. (See Def. Mem. 8–9.) Defendant further contends that there is no evidence that would permit an inference that Plaintiff's assignments were motivated by discrimination on the basis of her sex. (See Def. Mem. 9–15.) Plaintiff contests both arguments. (See Plf. Mem. 9–13.)

With respect to both these elements, the crux of the dispute revolves around the import of the work schedules of Plaintiff and her similarly-situated male colleagues.[6] Those schedules are, essentially, all the evidence in support of Plaintiff's claims, as she expressly acknowledged in her deposition. (See Crowley Dep. 218:6–17 ("It's all in the work schedules."); see also Crowley Dep. 113:20–21 ("[T]he numbers don't lie. The numbers are right there.").)[7] More specifically, with

---

[6] Both parties have provided numerical data interpreting the schedules using simple mathematical calculations—means, medians, maximums, and the like. (See, e.g., Pessia Aff., Ex. 2 (overtime hours of WCD shift leaders and whips).) Neither side has proffered any expert affidavit to opine as to whether, for example, Plaintiff's assignment of overtime hours did (or did not) deviate from her similarly-situated colleagues in a way that is statistically significant, although they were not required to do so. Courts have on occasion employed court-appointed experts in cases that raise significant technical or scientific issues, see Benjamin v. Fraser, 343 F.3d 35, 46 n. 12 (2d Cir. 2003) overruled on other grounds by Caiozzo v. Koreman, 581 F.3d 63 (2d Cir. 2009), but as the parties are apparently in agreement that the data provided is sufficient to decide this motion without expert analysis, the Court proceeds on that basis.

[7] Plaintiff's complaint includes an allegation of a disturbing, sexually-explicit voicemail that she received from an unknown male in the middle of the night on August 21, 2010. (Am. Compl. ¶ 48.) She, however, does not mention this voicemail in her opposition to Defendant's motion. Furthermore, Plaintiff testified that she did not know the identity of the caller, the message could have come from "some random person," the caller made no reference to her job or the fact that she worked for the Secret Service, and she did not tell any WCD supervisor about the message. (Crowley Dep. 139:23–140:3, 140:17–19; 141:5–11; 143:10–12; see also Def. Mem. 10 n. 2.) Accordingly, the call has no bearing on the Court's analysis.

respect to those schedules, Plaintiff uses the alleged differences in her schedule, on the one hand, and the schedules of her similarly-situated male colleagues, on the other, to establish both the fact of an adverse employment action and the inference of discrimination.  In short, she argues this alleged disparity is itself the adverse action and the evidence of discrimination.

The first question with respect to Plaintiff's discrimination claim, then, is whether the record demonstrates facts sufficient for a reasonable jury to find an adverse employment action.  "An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'"  Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)).  Although generalizations in this context should be approached with caution, "courts [in this circuit] have consistently rejected claims of discrimination arising from assignment of unwanted work schedules."  Constance v. Pepsi Bottling Co. of NY, No. 03-CV-5009 (CBA), 2007 WL 2460688, at *18 (E.D.N.Y. Aug. 24, 2007) (collecting cases).  Thus, for example, where a plaintiff's job, "by definition, subjected him to a changing work schedule," that plaintiff's "subjective opinion about his working schedule at any given point during his employment … d[id] not qualify as an adverse employment decision."  Rivera v. Potter, No. 03-CV-1991 (LAP), 2005 WL 236490, at *6 (S.D.N.Y. Jan. 31, 2005) (granting defendant's motion for summary judgment).  Similarly, a plaintiff's claim that "his work schedule became erratic and changed drastically from having almost every weekend off to having virtually none off at all" failed because the evidence did not show that his schedule was "materially worse than those of the other [employees]."  Bailey v. Associated Press, No. 01-CV-4562 (LTS), 2003 WL 22232967, at *3, *6 (S.D.N.Y. Sept. 29, 2003) (granting defendant's motion for summary judgment).

That said, the Second Circuit "has not ruled out the possibility that a shift [or other scheduling] change could rise to the level of an adverse employment action." Forsythe v. New York City Dept. of Citywide Admin. Servs., 733 F.Supp.2d 392, 400 (S.D.N.Y. 2010).[8] Two cases are instructive.  In Forsythe, where the plaintiff alleged that a shift change "severely disrupted his child care routine and ability to spend time with his son," the district court held that "an employment action that affects child care may, but does not necessarily, constitute an adverse employment action," and accordingly denied the defendant's motion for summary judgment.  Id. at 401.  Similarly, in Little v. Nat'l Broadcasting Co., 210 F.Supp.2d 330 (S.D.N.Y. 2002), the district court denied defendant's motion for summary judgment where the plaintiff "produced evidence that he incurred an actual loss in income because of lost overtime and that he was forced to work undesirable shifts with an erratic schedule."  Id. at 379.[9]

The second question here is whether there is sufficient evidence from which a jury could reasonably infer discrimination.  An inference of discrimination is permissible for purposes of the prima facie stage if Plaintiff shows that "a man similarly situated was treated differently."  Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997); accord Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 106 (2d Cir. 1989) (inference of discrimination may arise when female employees are treated less favorably than comparable male employees);

---

[8] Plaintiff invokes Gibson v. American Broadcasting Cos., Inc., 892 F.2d 1128, 1134 (2d Cir. 1989), in support of her position that the Second Circuit has explicitly recognized that unfavorable scheduling can constitute an adverse employment action.  It has been rightly noted, however, that "Gibson never mentions the phrase 'adverse employment action', nor does its analysis have any resemblance to such a claim."  Guglietta v. Meredith Corp., 301 F. Supp. 2d 209, 215 n. 1 (D. Conn. 2004).  Indeed, "[t]he district court in Gibson assumed that the plaintiffs had made their prima facie case of discrimination and, on appeal, the Second Circuit merely noted that the plaintiffs' allegations regarding their qualifications were accepted as true for purposes of establishing their prima facie case."  Albuja v. Nat'l Broad. Co. Universal, 851 F. Supp. 2d 599, 607 (S.D.N.Y. 2012).  More generally, however, there is authority that a change that affects the terms and conditions of a plaintiff's job "in a materially negative way," but does not result in a reduction in salary or benefits, may still qualify as an adverse employment action.  See Patrolmen's Benevolent Assoc. v. City of New York, 310 F.3d 43, 51 (2d Cir. 2002).

[9] Little, it should be noted, relies on Gibson, which is not directly on point, as discussed at n. 8, supra.

Schwabenbauer v. Bd. of Ed. of City Sch. Dist. of City of Olean, 667 F.2d 305, 309 (2d Cir. 1981) (same).  As such, on these facts, to the extent Plaintiff is able to show that the disparity was an adverse employment action, she also establishes sufficient evidence from which an inference of discrimination is permissible.

Against that background, the Court's task here is to determine whether there is sufficient evidence on this record from which a jury could reasonably find an adverse employment action and infer discrimination with respect to Plaintiff's claims concerning overtime, midnight shifts, weekends, and travel.  Ultimately, the Court need not decide whether the alleged material dispari-ties in Plaintiff's schedule could amount to an adverse employment action as a matter of law because, on this record, there is no evidence of any material disparities.[10]  And because there is no evidence of material disparities, Plaintiff cannot meet her minimal burden of establishing an ad-verse employment action or an inference of discrimination.  Summary judgment is thus appropriate.

### b)    *Comparator Group*

In undertaking an analysis of whether Plaintiff was treated differently than her peers, the predicate question is: Who are Plaintiff's peers?  "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."  Ruiz v. Cnty. of Rockland, 609 F.3d 486, 494 (2d Cir. 2010) (quoting Graham, 230 F.3d at 40).  Here, the parties agree that Plaintiff's similarly-situated colleagues are the other shift leaders and whips on the A, B, and C shifts.  (See

---

[10] The parties here have focused on the question of a material disparity and thus the Court does as well.  Even assuming a disparity had been shown here, it is far from clear that Plaintiff could sustain her prima facie burden.  Notably, for example, Plaintiff earned more in 2010 than in prior years.  (See Schoenberger Aff., Ex. G.)  Although she may have nevertheless earned less than she would have but for the alleged disparities, Plaintiff has not provided any evidence from which a reasonable juror could so find.

Def. Mem. 11; Plf. Mem. 13; Def. 56.1 ¶ 15; Plf. 56.1 ¶ 15.)[11]  Thus, although some of the data

introduced by Defendant refers to SAs Burr and Leshnower, the Court does not consider any data

for these agents insofar as they concern their time as OPS shift leaders.  As Plaintiff has noted, the

Secret Service attempted to minimize overtime hours for OPS shift leaders (Plf. 56.1 ¶ 36.1) and

SAs Burr and Leshnower worked almost no overtime in the periods when they served as OPS shift

leader (Pessia Aff., Ex. 2).  Similarly, these agents worked no midnight shifts (Pessia Aff., Ex. 3),

had two full weekend days off each week (Pessia Aff., Ex. 4), and did not travel at all (Pessia Aff.,

Ex. 5) while working as OPS shift leaders.

### 3.    Overtime

The first, and perhaps most significant, part of Plaintiff's discrimination claim concerns

the amount of overtime for which she was scheduled.  She notes that from January 10 through May

22, 2010, she worked only 79.5 hours of overtime (with a weekly average of 3.97) while her sim-

ilarly-situated male colleagues worked "considerably more."[12]  (Plf. Mem. 10.)  Although Plaintiff

acknowledges that at times her numbers "may appear to be comparable, when averaged and com-

pared to the male agents," she asserts that this is "the result of too few and inequitably distributed

overtime in the first four and a half months of the year and the subsequent drastic overload of

---

[11] Plaintiff's testimony includes mention of seniority in scheduling.  (See, e.g., Crowley Dep. 58:17–20 (ex-plaining that when she was OPS shift leader, Plaintiff made assignments "by seniority, when I could" because "[t]hat was how we ran things on our detail.").)  Plaintiff also asserts that she was the shift leader with the "most seniority." (Crowley Aff. ¶ 26.)  On this basis, she argues that "[w]hile she was the most senior shift leader, she was consistently given less overtime, less desireable [sic] travel assignments, and worse shifts than her male colleagues."  (Plf. Mem. 13.)  To the extent that Plaintiff is suggesting that differential treatment is revealed after taking account of relative seniority, the Court cannot give effect to this line of reasoning.  Accepting that Plaintiff was the senior most shift leader, first, as already noted, there is no disagreement between the parties that "[f]or scheduling purposes, a Shift Leader and a Whip are interchangeable positions."  (Def. 56.1 ¶ 15; Plf. 56.1 ¶ 15.)  On that basis, for the reasons explained in the course of the analysis that follows, the Court fails to identify any material disparity between Plaintiff and her similarly-situated peers.  Second, to the extent Plaintiff seeks to make distinctions within the shift leader/whip group on the basis of seniority, (see, e.g., Plf. Mem. 5 ("Ordinarily, the agent with the most seniority (the "Senior Shift Leader") received the most preferred schedule.")), she has an obligation to bring forward specific evidence in support of such a distinction.  There is no such evidence here.

[12] With respect to the accuracy of this weekly average figure, see n. 19, infra.

overtime ... after she complained." (Plf. Mem. 11.)  The Court cannot agree.  Viewing the record as a whole in the light most favorable to Plaintiff, there is insufficient evidence to support the claim that Plaintiff was treated differently than her similarly-situated male colleagues.

### a)     *Overall Period*

Beginning with Plaintiff's entire period of employment as the C shift leader from January 11 through December 10, 2010, Defendant's uncontroverted evidence establishes that Plaintiff's average overtime hours are well within the range of her male peers.  More specifically, as shown in Table 1, the similarly-situated group's average weekly overtime ranged from a low of 3.85 hours to a high of 11 hours, with an average of the averages of 7.12 hours.[13]  During the same period, Plaintiff worked an average of 6.47 overtime hours each week.

**Table 1: Average Overtime Hours Jan. 10–Dec. 11**
(adapted from Pessia Aff. ¶ 20)

| Agent | Mean Hours/ Week |
|---|---|
| Cline *(worked 27/48 weeks)* | 3.85 |
| Meyers *(worked 13/48 weeks)* | 5.12 |
| Bross | 5.61 |
| Skelly *(worked 7/48 weeks)* | 5.86 |
| Beck | 6.05 |
| Leshnower *(worked 39/48 weeks)* | 6.30 |
| **Crowley** | **6.47** |
| Stone *(worked 38/48 weeks)* | 6.99 |
| **Average** | **7.12[14]** |
| Karl *(worked 32/48 weeks)* | 7.20 |
| Hanson | 7.62 |
| DeYoung *(worked 24/48 weeks)* | 7.96[15] |
| Paulhus | 8.41 |
| DeSimone *(worked 7/48 weeks)* | 10.64 |
| Burr *(worked 9/48 weeks)* | 11.00 |

---

[13] In all instances where a mean figure is offered, whether by a party or by the Court, it excludes Plaintiff in the calculation.

[14] SA Pessia's affidavit reports this figure as 7.08.  (Pessia Aff. ¶ 21.)

[15] SA Pessia's affidavit reports this figure as 8.00.  (Pessia Aff. ¶ 20.)

Put differently, looking at the data, Plaintiff's average weekly overtime hours are actually higher than six similarly-situated male agents and lower than seven such agents; she is, in other words, squarely in the middle of the pack.  Notably, Plaintiff does not quarrel with Defendant's position, as stated by SA John Pessia, that, as a general matter, "because not all individuals worked the same number of weeks in any given period, the average weekly overtime hours is a better metric for comparison between individuals."  (Pessia Aff. ¶ 19.)[16]

Although there are fewer data points for total overtime hours worked over the period—because only three agents other than Plaintiff worked that entire period—even this way of analyzing the data does not evidence a material disparity between Plaintiff's hours and those of her peers, as can be seen in Table 2.

**Table 2: Total Overtime Hours Jan. 10–Dec. 11**
(adapted from Pessia Aff. ¶ 20)

| Agent | Total Hours |
| --- | --- |
| Beck | 290.5 |
| **Crowley** | **310.75** |
| **Average** | **353.25** |
| Hanson | 365.75 |
| Paulhus | 403.5 |

Over the entire period, the relevant low is 290.5 hours, the relevant high is 403.5 hours, with an average of 353.25 hours.  Meanwhile, Plaintiff worked 310.75 hours in the same time.

### b)      *The Period Before Plaintiff Voiced Her Concerns*

Looking to the period before Plaintiff voiced her concerns to ASAIC McAleer and SA Burr, it is true that Plaintiff's overtime hours are on the low end of the group.  They are, however, not the lowest, nor are they markedly different from those of her peers, as can be seen in Table 3.

---

[16] Indeed, Plaintiff too uses average weekly hours to make her case.  (See Plf. 56.1 ¶ 31.1.)

**Table 3: Total Overtime Hours Jan. 10–May 22**
(adapted from Pessia Aff. ¶ 22)

| Agent | Total Hours |
|---|---|
| Cline | 66.25 |
| **Crowley** | **79.5** |
| Bross | 80.75 |
| Hanson | 87 |
| **Average**[17] | **89.2** |
| Paulhus | 94.5 |
| Beck | 94.5 |
| Leshnower | 112 |

During this period, the total overtime hours for similarly-situated agents who also worked the entire period from January 10 through May 22 ranged from a low of 66.25 hours to a high of 112 hours, with an average of 89.2 hours. Significantly, six of the eight agents, including Plaintiff with 79.5 hours, fell within the relatively narrow range of roughly 80 hours to 95 hours, with two outliers—one on each of the high and low ends.[18]

The situation is not materially different with respect to mean weekly overtime hours in the period, as illustrated by Table 4, on the following page.

---

[17] This average figure was not provided by SA Pessia and has thus been calculated by the Court.

[18] It should be noted that one agent who did not work the entire period—SA Michael Stone, who worked 13 of the 19 weeks from January 10 to May 22—worked a total of 108 total overtime hours, or 6.75 hours on average each week in that period.

**Table 4: Mean Overtime Hours Jan. 10–May 22**
(adapted from Pessia Aff. ¶ 22)

| Agent | Mean Hours/ Week |
|---|---|
| Karl *(worked 3/19 weeks)* | 0 |
| Cline | 3.49 |
| **Crowley** | **4.18[19]** |
| Bross | 4.25 |
| Hanson | 4.58 |
| **Average** | **4.87[20]** |
| Paulhus | 4.97 |
| Beck | 4.97 |
| Meyers *(worked 13/19 weeks)* | 5.11 |
| Leshnower | 5.89 |
| Stone *(worked 16/19 weeks)* | 6.75 |
| DeYoung *(worked 3/19 weeks)* | 8.67 |

Even viewing these figures in the light most favorable to Plaintiff, it cannot be said that whatever difference exists amounts to a material disparity: One agent who worked the entirety of the period worked less overtime than Plaintiff (i.e., SA Cline), and several who worked over the same period worked roughly four hours of overtime on average per week (i.e., SA Bross, Hanson, Paulhus, Beck).

    **c)**    ***The Period After Plaintiff Voiced Her Concerns***

Looking to the period after Plaintiff spoke up about her concerns shows no material disparity either. Among the five agents who worked for the entire period between May 23 and December 11, Plaintiff is in the middle of the group, with two agents working fewer overtime hours and two working more, as shown by Table 5 on the page that follows.

---

[19] SA Pessia's affidavit reports this figure as 4.48—not 4.18—presumably as a result of a typo. (See Pessia Aff. ¶ 22.) As noted above, Plaintiff believes it to be 3.97, although that appears clearly to be a result of incorrectly dividing the total hours—everyone agrees that number is 79.5 hours—by 20 weeks, not 19 weeks, resulting in 3.975, and then rounding down, instead of up. (For the underlying figures, see Pessia Aff., Ex. 2.)

[20] SA Pessia's affidavit reports this figure as 4.83. (Pessia Aff. ¶ 23.)

**Table 5: Total Overtime Hours May 23–Dec. 11**
(adapted from Pessia Aff. ¶ 24)

| Agent | Total Hours |
|---|---|
| Beck | 196 |
| Karl | 230.25 |
| **Crowley** | **231.25** |
| **Average**[21] | **253.5** |
| Hanson | 278.75 |
| Paulhus | 309 |

The situation is no different when it comes to Plaintiff's average weekly hours.  Among those agents who worked all or substantially all of the period, as shown in Table 6, the weekly average is 6.69 hours on the low end and 10.66 hours on the high end, with most agents in the 6- to 8-hour range.  Plaintiff had an average of 7.97 hours.

**Table 6: Mean Overtime Hours May 23–Dec. 11**
(adapted from Pessia Aff. ¶ 24)

| Agent | Mean Hours |
|---|---|
| Cline *(worked 8/29 weeks)* | 4.72 |
| Skelly *(worked 7/29 weeks)* | 5.86 |
| Leshnower *(worked 20/29 weeks)* | 6.69 |
| Beck | 6.76 |
| Bross *(worked 22/29 weeks)* | 6.78 |
| Stone *(worked 22/29 weeks)* | 7.16 |
| DeYoung *(worked 21/29 weeks)* | 7.86 |
| Karl | 7.94 |
| **Crowley** | **7.97** |
| **Average** | **7.97** |
| Hanson | 9.61 |
| DeSimone *(worked 7/29 weeks)* | 10.64 |
| Paulhus | 10.66 |
| Burr *(worked 9/29 weeks)* | 11.00 |

    **d)**      *The Alleged "Overloading" of Overtime Hours*

Plaintiff also argues that she was "inundated" with overtime shortly after she spoke with ASAIC McAleer and SA Burr about her concerns.  (Plf. Mem. 11.)  She points to the four-week period between May 23 and June 19 when she worked 65.75 hours and, more specifically, to the two-week period between May 23 and June 5 when she worked 50.75 hours.  (Plf. Mem. 11.)

---

[21] These average figures were not provided by SA Pessia and has thus been calculated by the Court.

While Plaintiff is correct about these numbers, they do not set her apart from her colleagues, as is evident from Tables 7 and 8.

**Table 7: Maximum Overtime Hours Worked in Any Four-Week Period Between May 23–Dec. 11 (Sorted by Hours)**
(adapted from Pessia Aff., Ex. 2)

| Agent | Week #s | Hours | Plf.'s Hours in Same Period |
|-------|---------|-------|------------------------------|
| Cline | 21–24[22] | 25.75 | 65.75 |
| Skelly | 43–46 | 41 | 43.5 |
| Burr | 45–48 | 53 | 38.5 |
| Bross | 23–26 | 56.25 | 23 |
| Stone | 36–39 | 59 | 27 |
| Karl | 38–41 | 60 | 40 |
| Leshnower | 22–25 | 61.25 | 49.5 |
| **Average** | **N/A** | **62.92** | **N/A** |
| **Crowley** | **21–24** | **65.75** | **65.75** |
| DeYoung | 43–46 | 66 | 43.5 |
| DeSimone | 43–46 | 68.5 | 43.5 |
| Beck | 43–46 | 77 | 43.5 |
| Hanson | 41–44 | 85.5 | 26 |
| Paulhus | 23–26 | 101.75 | 23 |

**Table 8: Maximum Overtime Hours Worked in Any Two-Week Period Between May 23–Dec. 11 (Sorted by Hours)**
(adapted from Pessia Aff., Ex. 2)

| Agent | Week #s | Hours | Plf.'s Hours in Same Period |
|-------|---------|-------|------------------------------|
| Skelly | 45–46 | 26 | 36.5 |
| Leshnower | 22–23 | 34.25 | 40.5 |
| Stone | 22–23 | 34.5 | 40.5 |
| Burr | 45–46 | 41 | 36.5 |
| DeSimone | 45–46 | 44.5 | 36.5 |
| **Average** | **N/A** | **44.75** | **N/A** |
| Bross | 25–26 | 45.25 | 8 |
| DeYoung | 45–46 | 50 | 36.5 |
| Karl | 25–26 | 50.5 | 8 |
| **Crowley** | **21–22** | **50.75** | **50.75** |
| Hanson | 41–42 | 54.5 | 19 |
| Beck | 45–46 | 65 | 36.5 |
| Paulhus | 25–26 | 69.75 | 8 |

---

[22] This is actually a three-week period, because SA Cline made zero overtime hours the week of June 13 (Week 24).  However, the entire four-week period is reported in the interests of consistency.

With the single of exception of SA Walter Cline, who only worked eight weeks between May 23 and December 11, all agents had two- and four-week periods when they worked unusually high hours. Indeed, five male agents worked more than Plaintiff's 65.75 hours in four weeks, including SA Michael Paulhus who worked 101.75 hours in a four-week span—and more than 51 hours in a single week alone.[23] (See Pessia Aff., Ex. 2 (Week 25).) Nor is Plaintiff's working 50.75 hours in a two-week span out of the ordinary: Five agents other than Plaintiff also worked 50 or more hours within a two-week span, as illustrated in Table 8.[24]

Although Plaintiff does not point this out, it is true that she worked more than any other agent in the two-week period between May 23 and June 4, as shown in Table 9.

**Table 9: Overtime Hours May 23–June 5 (Sorted by Total)**
(adapted from Pessia Aff., Ex. 2)

| Agent | 5/23 Hours | 5/30 Hours | Total |
|---|---|---|---|
| Karl | 2 | 0 | 2 |
| Paulhus | 0 | 2.25 | 2.25 |
| Beck | 10 | 4 | 14 |
| Leshnower | 0 | 21.25 | 21.25 |
| Cline | 4 | 17.75 | 21.75 |
| Bross | 11.5 | 14 | 25.5 |
| Stone | 4 | 22.25 | 26.5 |
| Hanson | 4 | 23.75 | 27.75 |
| **Crowley** | **18.25** | **32.5** | **50.75** |

However, it is not remarkable that Plaintiff worked as much as she did in those two weeks while others worked fewer overtime hours in the same period, as there were other weeks when the roles were reversed. As shown in Table 8, for example, while SAs Bross, Karl, and Paulhus worked 45.25, 50.5, and 69.75 hours, respectively, in the two weeks between June 20 and July 3, Plaintiff had only eight overtime hours.

---

[23] If the period is expanded to five-weeks, SA Hanson's record of 112 overtime hours is particularly stark compared with Plaintiff's 67.75 hours. (See Pessia Aff., Ex. 2.)

[24] The Court has also considered the one other period when Plaintiff had an unusually high number of overtime: the week of November 7, with 36.5 hours. In that week, however, every colleague was working an unusual amount of overtime. Three agents worked essentially the same (34, 35.5, and 36 hours), four worked less (16, 21, 26.5, and 28.5 hours), and one worked more (52 hours). (See Pessia Aff., Ex. 2 (Week 45).)

Finally, Plaintiff did not have an outsized number of weeks with high amounts of overtime, as demonstrated by Table 10.

**Table 10: Number of Weeks With High Overtime Hours Jan. 10–Dec. 11 (Sorted by Agent)** (adapted from Pessia Aff., Ex. 2)

| Agent | Weeks with >20 Overtime Hours | Weeks with >30 Overtime Hours | Weeks with >40 Overtime Hours |
|---|---|---|---|
| Beck | 4 | 1 | 1 |
| Bross | 3 | 1 | 0 |
| Burr | 1 | 1 | 0 |
| Cline | 1 | 1 | 0 |
| **Crowley** | **2** | **2** | **0** |
| DeSimone | 2 | 1 | 0 |
| DeYoung | 2 | 0 | 0 |
| Hanson | 6 | 1 | 0 |
| Karl | 4 | 1 | 0 |
| Leshnower | 4 | 0 | 0 |
| Meyers | 1 | 0 | 0 |
| Paulhus | 5 | 4 | 1 |
| Skelly | 0 | 0 | 0 |
| Stone | 2 | 0 | 0 |
| **Average** | **2.64** | **0.92** | **0.14** |
| **Median** | **2** | **1** | **0** |
| **Mode** | **2** | **1** | **0** |

Indeed, the uncontradicted evidence shows that as compared with the three male agents who also worked the entire period from January 10 through December 11 (SAs John Beck, Hanson, and Paulhus), Plaintiff had fewer weeks with greater than 20 hours of overtime (2 vs. 4, 6, and 5, respectively). She did have more weeks with more than 30 hours overtime compared to SAs Beck and Hanson (2 vs. 1) but fewer weeks compared to SA Paulhus (1 vs. 4). And she had no weeks with more than 40 hours of overtime, unlike SAs Beck and Paulhus, who both had one such week (SA Hanson also had no such week). Overall, none of these numbers can reasonably suggest a material disparity between Plaintiff and her colleagues.

e)    *Conclusion on Overtime*

In sum, whether looking at Plaintiff's time as C shift leader as a whole, or looking at periods before and after she first voiced her concerns, Plaintiff's overtime does not materially diverge from

those of her similarly-situated male peers.  Plaintiff's response that these numbers are inflated by her being "inundated" with significant overtime shortly after voicing her concerns is inapposite because her numbers were not materially different to begin with.  In any event, when viewed in narrow slices, the data suggest disparities in overtime not merely for Plaintiff, but for all agents. As Plaintiff herself acknowledges, it is unlikely for any one agent to have the same amount of overtime as any other agent over a given period of time.  (Crowley Dep. 154:14–20; Def. 56.1 ¶ 34; Plf. 56.1 ¶ 34.)  Thus, while Plaintiff worked a significant 67.5 hours in the four weeks between May 23 and June 19, several of her male colleagues similarly had periods where they too were "inundated" with overtime.  As a result, Plaintiff has been unable to point to any evidence of a material disparity in her overtime.

### 4.   Midnight Shifts

Plaintiff also contends that she faced "excessive scheduling of midnight shifts" as compared with her male colleagues.  (Plf. Mem. 11.)  The record cannot support this contention, as evident from the data reproduced in Table 11.

**Table 11: Midnight Shifts Jan. 10–Dec. 11 (Sorted by % of Total Midnight Shifts Worked)**
(reproduced based on Pessia Aff. ¶ 34)

| Agent | Total # Midnight Shifts | Average # Midnight Shifts/Week | % of WCD's Total Midnight Shifts Worked in Period | # Weeks in Calculation |
|---|---|---|---|---|
| Burr | 5 | 0.56 | 1.26% | 9 |
| Meyers | 5 | 0.38 | 1.26% | 13 |
| DeSimone | 9 | 1.29 | 2.27% | 7 |
| Skelly | 13 | 1.86 | 3.28% | 7 |
| DeYoung | 24 | 1.00 | 6.06% | 24 |
| Cline | 28 | 1.04 | 7.07% | 27 |
| Stone | 30 | 0.80 | 7.58% | 38 |
| Leshnower | 36 | 0.92 | 9.09% | 39 |
| Beck | 37 | 0.77 | 9.34% | 48 |
| Bross | 38 | 0.93 | 9.60% | 38 |
| Hanson | 39 | 0.81 | 9.85% | 48 |
| Karl | 41 | 1.28 | 10.35% | 32 |
| **Crowley** | **42** | **0.88** | **10.61%** | **48** |
| Paulhus | 49 | 1.02 | 12.37% | 48 |

Based on the evidence adduced by Defendant, Plaintiff's average number of midnight shifts per week was well within the range of her colleagues.  Plaintiff worked an average of 0.88 midnight shifts per week, while the range for her colleagues was between 0.38 and 1.86 midnight shifts on average per week.  It should be noted, however, that both the low and high from that range represent data points from two agents who worked relatively few weeks.  Even among those agents who worked the full period that Plaintiff worked, however, the numbers do not evidence any material disparity, as shown in Table 12, which is a subset of Table 11.  Thus, whether measured against those agents who worked precisely the schedule that she worked or the larger cohort of similarly-situated agents, Plaintiff's schedule is, again, in the middle of the pack.

**Table 12: Midnight Shifts for Agents Who Worked Full Period Jan. 10–Dec. 11 (Sorted by % of Total Midnight Shifts Worked)** (reproduced based on Pessia Aff. ¶ 34)

| Agent | Total # Midnight Shifts | Average # Midnight Shifts/Week | % of WCD's Total Midnight Shifts Worked in Period | # Weeks in Calculation |
|---|---|---|---|---|
| Beck | 37 | 0.77 | 9.34% | 48 |
| Hanson | 39 | 0.81 | 9.85% | 48 |
| **Average**[25] | **41.67** | **0.87** | **10.52%** | **N/A** |
| **Crowley** | **42** | **0.88** | **10.61%** | **48** |
| Paulhus | 49 | 1.02 | 12.37% | 48 |

In saying that Plaintiff's midnight shifts do not evidence a material disparity, the Court does not overlook her evidence of being scheduled for nine midnight shifts within a two-week span.  (See Crowley Aff. ¶ 20; see also Pessia Aff., Ex. 3 (Weeks 30–31).)  The difficulty for Plaintiff's claim is that she was not alone in that regard: SA Paulhus was scheduled for eight midnight shifts in Weeks 13–14, SA Beck for nine midnight shifts in Weeks 38–39, SA Karl for eight midnight shifts in Weeks 44–45, and SA Cline for eight midnight shifts in Weeks 17–18.  (See Pessia Aff., Ex. 3.)  More generally, in the period after Plaintiff first voiced her concerns about

---

[25] These average figures were not provided by SA Pessia and has thus been calculated by the Court.

overtime and travel, she never had more than eight midnight shifts in any given four-week period, unlike most of her peers.  This is illustrated by Table 13, below.

**Table 13: Midnight Shifts in Any Four-Week Period Between May 23–Dec. 11 (Sorted by # Midnight Shifts)** (adapted from Pessia Aff., Ex. 3)

| Agent | Week #s | # Midnight Shifts | # Plf.'s Shifts in Same Period |
|-------|---------|-------------------|-------------------------------|
| Cline | 21–24[26] | 6 | 3 |
| **Crowley** | **29–32** | **8** | **N/A** |
| DeYoung | 49–52 | 8 | 1 |
| Stone | 31–34 | 8 | 4 |
| DeSimone | 45–48[27] | 9 | 3 |
| **Average** | **N/A** | **9.92** | **N/A** |
| Beck | 36–39[28] | 10 | 7 |
| Hanson | 35–38 | 10 | 6 |
| Leshnower | 23–26 | 11 | 4 |
| Paulhus | 25–28 | 11 | 1 |
| Skelly | 47–50 | 11 | 3 |
| Bross | 22–25 | 12 | 4 |
| Karl | 44–47 | 15 | 1 |

Given Plaintiff's evidence concerning the undesirability of midnight shifts generally (see Crowley Aff. ¶ 25, Morrison Aff. ¶¶ 10, 12) and her own testimony concerning her wish to have such shifts balanced with day and evening shifts (see Crowley Aff. ¶ 24; Crowley Dep. 120:5–7), it is difficult to conceive how having fewer midnight shifts in any rolling four-week period could constitute an adverse employment action, even from Plaintiff's subjective standpoint.

### 5.      Weekends

Plaintiff next contends that she was discriminated against on the basis that she worked 11 consecutive weekends between July and October 2010.  (Plf. Mem. 18.)  Although this is again

---

[26] This is actually a three-week period, because SA Cline had no midnight shifts on either side of the three-week block when he had 10 such shifts. The entire four-week period is reported in the interests of consistency and one of the two weeks on either side of the three-week block was selected on the basis of whichever week would show Plaintiff as having more midnight shifts in that week, in accordance with the Court's obligation to view the evidence in the light most favorable to Plaintiff.

[27] The situation with SA DeSimone is the same here as with SA Cline. See n. 26, supra.

[28] The situation with SA Beck is the same here as with SA Cline. See n. 26, supra.

undisputed, the evidence adduced by Defendant defeats any contention that this was materially different than Plaintiff's peers.  As illustrated by Table 14, Plaintiff's overall weekend work was within the range of her male peers.

**Table 14: Percentage of No Weekend Days Jan. 9–Dec. 5 (Sorted by %)**
(adapted from Pessia Aff., Ex. 4)

| Agent | # Weeks in Sample | # Weeks with No Days Off | % |
|-------|-------------------|--------------------------|---|
| Skelly | 7 | 1 | 14.29% |
| Leshnower | 39 | 11 | 28.21% |
| Burr | 9 | 3 | 33.33% |
| Stone | 38 | 14 | 36.84% |
| DeYoung | 24 | 10 | 41.67% |
| **Average** | **N/A** | **N/A** | **42.85%** |
| Paulhus | 48 | 21 | 43.75% |
| Beck | 48 | 21 | 43.75% |
| Bross | 41 | 18 | 43.90% |
| Cline | 27 | 12 | 44.44% |
| **Crowley** | **48** | **22** | **45.83%** |
| Meyers | 13 | 6 | 46.15% |
| Hanson | 48 | 24 | 50.00% |
| Karl | 32 | 18 | 56.25% |
| DeSimone | 7 | 5 | 71.43% |

Of the 48 weeks that are relevant for present purposes, Plaintiff had no weekend days off in 22 of those weeks.  That amounts to 45.83 percent of the weeks she worked, which is well within the broad range of the whole group (14.29 to 71.43 percent) and similar to SAs Paulhus, Beck, and Hanson, who worked an identical number of weeks (43.75, 43.75, and 50 percent, respectively). The situation is comparable with respect to weeks with one weekend day off (shown in Table 16, below), as it is with respect to weeks with the complete two weekend days off (shown in Table 17, below).  Although Plaintiff did have fewer full weekends off compared to those three male agents who also worked during the full period (15 compared with SA Paulhus's 16, SA Beck's 20, and SA Hanson's 18), this disparity cannot reasonably be said to be material.

**Table 15: Percentage of 1-Day Weekend Days Jan. 9–Dec. 5 (Sorted by %)**
(adapted from Pessia Aff., Ex. 4)

| Agent | # Weeks in Sample | # Weeks with 1 Day Off | % |
|---|---|---|---|
| Cline | 27 | 3 | 11.11% |
| DeYoung | 24 | 3 | 12.50% |
| Hanson | 48 | 6 | 12.50% |
| Karl | 32 | 4 | 12.50% |
| DeSimone | 7 | 1 | 14.29% |
| Beck | 48 | 7 | 14.58% |
| Burr | 9 | 2 | 22.22% |
| **Average** | **N/A** | **N/A** | **22.86%** |
| Paulhus | 48 | 11 | 22.92% |
| **Crowley** | **48** | **11** | **22.92%** |
| Meyers | 13 | 3 | 23.08% |
| Bross | 41 | 10 | 24.39% |
| Stone | 38 | 10 | 26.32% |
| Leshnower | 39 | 17 | 43.59% |
| Skelly | 7 | 4 | 57.14% |

**Table 16: Percentage of Full Weekends Jan. 9–Dec. 5 (Sorted by %)**
(adapted from Pessia Aff., Ex. 4)

| Agent | # Weeks in Sample | # Weeks with 2 Days Off | % |
|---|---|---|---|
| DeSimone | 7 | 1 | 14.29% |
| Leshnower | 39 | 11 | 28.21% |
| Skelly | 7 | 2 | 28.57% |
| Meyers | 13 | 4 | 30.77% |
| **Crowley** | **48** | **15** | **31.25%** |
| Karl | 32 | 10 | 31.25% |
| Bross | 41 | 13 | 31.71% |
| Paulhus | 48 | 16 | 33.33% |
| **Average** | **N/A** | **N/A** | **34.29%** |
| Stone | 38 | 14 | 36.84% |
| Hanson | 48 | 18 | 37.50% |
| Beck | 48 | 20 | 41.67% |
| Burr | 9 | 4 | 44.44% |
| Cline | 27 | 12 | 44.44% |
| DeYoung | 24 | 11 | 45.83% |

Plaintiff's assertion that she worked 11 consecutive weekends between July and October, requires further discussion.  The record establishes that 11 consecutive weekends was more than any other agent.  (See Pessia Aff., Ex. 4.)  Both SAs Bross and Hanson, however, also worked for long stretches without two consecutive weekend days off.  SA Bross worked nine consecutive

weekends between May and June, and SA Hanson also worked nine consecutive weekends between September and November.  (See Pessia Aff., Ex. 4.)  Although this two-week difference might reasonably constitute evidence of a disparity, it would be unreasonable to conclude it amounts to evidence of a material disparity.  Furthermore, when Plaintiff asked for a modification to her schedule so she could have a full weekend, that request was granted.  (See Schoenberger Aff., Ex. F.)

### 6.     Travel

Finally, Plaintiff asserts that her schedule "contained less travel" than her male colleagues and the travel that did occur was "undesirable."  (Plf. Mem. 12.)  The initial difficulty here is that Plaintiff has offered no objective standard against which to measure the desirability of travel assignments.  Plaintiff testified that "[e]veryone [was] different" when it came to their preferences, (Crowley Dep. 63:9).[29]  As she explained, "some people are history buffs, some people are beach buffs," while others "love to go to the rougher places."  (Crowley Dep. 62:24–25, 196:19–20.)  Courts, however, require "objective indicia of material disadvantage" to ground an adverse employment action; "subjective, personal disappointment is not enough."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 164 (2d Cir. 2008) (internal quotation marks and alterations omitted).

Defendant's evidence makes clear that no two agents had the same travel schedule and each agent had an assortment of domestic and foreign travel.  (See Pessia Aff., Ex. 5.)  Plaintiff,

---

[29] Plaintiff has provided evidence that "[i]t was common knowledge amongst the agents on the detail that there were good travel assignments and left-over travel assignments." (Morrison Aff. ¶ 6.)  She, however, has not provided any evidence or argument fleshing out this contention by identifying which of her and the other agents' travel assignments were desirable and which were not.  For example, SA Morrison averred that advance trips were desirable because they allowed "time to be in a foreign city for longer than a normal shift, allowing for exploring or sightseeing." (Morrison Aff. ¶ 13.)  Assuming for present purposes that a material disparity in advance trips could constitute an adverse employment action, Plaintiff nevertheless has adduced no evidence of disparities in the assignment of advance trips.  Furthermore, and although this does not factor in the Court's reasoning, the Court would be remiss if it did not note that, even with respect to advance trips, Plaintiff herself testified that "there were certain agents, they did not want to do advances." (Crowley Dep. 31:13–14.)

for example, in the period from January to June, traveled to Boston, Mass.; Davos, Switzerland; Orlando, Fl.; Little Rock, Ark.; Naples, Fl.; Saudi Arabia; Philadelphia, Pa.; Haiti; the Dominican Republic; Lima, Peru; and Bogota, Columbia.   From July through December, she traveled to Charleston, W. Va.; Aspen, Colo.; Rhineback, N.Y.; Bridgehampton, N.Y.; Las Vegas, Nev.; Kiev, Ukraine; Long Island, N.Y.; Jacksonville, Fl.; Miami, Fl.; and Singapore.   Plaintiff has not pointed to any objective criteria on which to find a material disparity—and the Court discerns none on its own—between her schedule and those of her similarly-situated male colleagues.[30]

Plaintiff's related contention about traveling on President Clinton's private plane—raised for the first time in her opposition to Defendant's motion—fares no better.   Specifically, Plaintiff asserts that she did not travel on President's Clinton private plane between July and December. (Crowley Aff. ¶ 12.)   There is no evidence in the record, however, as to how much other agents traveled on the plane.   Even accepting Plaintiff's evidence that travel on the private plane was objectively desirable because it was considered, among other things, a career advancement opportunity (see, e.g., Morrison Aff. ¶ 13–15), it is not sufficient for Plaintiff to merely allege that she was treated differently in this regard.   Her burden at the prima facie stage may well be minimal, but it is "it is not entirely without substance."   Spiegler v. Israel Discount Bank of New York, 01-CV-6364 (WK), 2003 WL 21488040, at * 6 (S.D.N.Y. June 25, 2003).   Because she has offered no evidence of any disparity in agent travel in this manner, this argument cannot succeed.

---

[30] To the extent the satisfaction of subjective preferences is relevant, it is notable that Plaintiff requested the trips to Haiti (Burr Dep. 64:20–65:16; Dinkins Dep.44:9–10) and Las Vegas (Crowley Dep. 84:17–19).

**B.      Retaliation Claim**

**1.      Legal Framework**

Title VII forbids any employer from "discriminat[ing] against any of [its] employees ... because he has made a charge, testified, assisted, or participated in any manner in a [Title VII] investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a).  "This anti-retaliation provision is intended to further the goals of the anti-discrimination provision 'by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees.'" Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006) (alteration in original).)  "[T]he plaintiff need not prove that her underlying complaint of discrimination had merit," Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012), but only that it was motivated by a "good faith, reasonable belief that the underlying employment practice was unlawful," Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (citation and internal quotation marks omitted).

Retaliation claims under Title VII employ a version of the familiar three-step burden-shifting framework first articulated in McDonnell Douglas, 411 U.S. at 802–05.  See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  First, the plaintiff must establish a prima facie case of retaliation by showing: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Id. (quoting McMenemy v. City of Rochester, 241 F.3d 279, 282–83 (2d Cir. 2001)).

As with discrimination claims under Title VII, the plaintiff's burden in this regard is "de minimis," and the court's role on summary judgment "is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory

motive." Id. (internal quotation marks omitted).  Unlike discrimination claims, however, "anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harm."  Hicks v. Baines, 593 F.3d at 165 (internal quotation marks omitted).  "Actions are materially adverse if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotation marks omitted.)

If the plaintiff sustains this initial burden, "a presumption of retaliation arises," the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." Jute, 420 F.3d at 173.  If the employer satisfies this burden, the plaintiff must then demonstrate that the proffered reason is pretext for retaliation and that the plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, ___ U.S. ___, 133 S.Ct. 2517, 2534 (2013); see also Kwan, 737 F.3d at 845.

### 2.    Discussion

Assuming that Plaintiff's retaliation claim is properly before the Court,[31] it cannot succeed because Plaintiff has not shown any adverse employment action.  Plaintiff asserts that the retaliation she suffered was limited to the assignment of overtime, midnight shifts, weekends, and travel.  That is, she relies on "th[e] same evidence" invoked in support of her discrimination claim for her retaliation claim.  (See Plf. Mem. 18, 4.)[32]  For the reasons already discussed, see supra 19–34,

---

[31] Defendant argues that Plaintiff's retaliation cannot be heard because she failed to exhaust administrative remedies with respect to this claim.  (See Def. Mem. 15–17.)  Plaintiff disagrees, principally on the basis that her present claims are "reasonably related" to those that were filed with the Equal Employment Opportunity Commission.  (See Plf. Mem. 14 (citing Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) (per curiam)).)  In light of the Court's conclusion that Plaintiff's retaliation claims fails on the merits, it need not decide the exhaustion issue.

[32] Plaintiff does not invoke her evidence of the hostile call from SA Burr on July 10 in support of her retaliation claim, nor does she rely on her evidence of a "surprise" fitness test.  (See Crowley Aff. ¶¶ 15, 18–21.)  Plaintiff has described SA Burr as "incredibly angry" on that call and testified that he chastised Plaintiff for "causing problems" because "there was nothing wrong with the schedules."  (Crowley Aff. ¶ 15; see also Crowley Dep. 102:11, 102:17–

and even under <u>White</u>'s more generous definition of adverse employment actions, there is no evidence in this record from which a reasonable jury could find that Plaintiff suffered such action. More specifically, Plaintiff cannot show a "materially adverse" action against her that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>White</u>, 548 U.S. at 68 (internal quotation marks omitted); <u>see also</u> <u>Hicks v. Baines</u>, 593 F.3d at 165–66. Indeed, <u>White</u> "emphasized the need for [an] objective standard[]" for retaliation claims, 548 U.S. at 69, and in the context of this case an objective standard requires an analysis not of Plaintiff's subjective opinion of her schedule, but rather an analysis of how her schedule compares to that of her peers. Because Plaintiff has not pointed to any facts not already addressed in the course of analyzing her discrimination claim, no more need be said.

## IV.   CONCLUSION

Although this Court is hesitant to grant summary judgment in Title VII cases, recognizing that it must do so sparingly, here it is compelled to do so. The Court does not doubt the sincerity of Plaintiff's belief that she was unfairly treated. Indeed, there is no disagreement here that Plaintiff worked for an organization where those creating the work schedules—the WCD OPS team—were afforded significant discretion. With such discretion comes the risk of favoritism, including favoritism in the way schedules are assigned. Even accepting that there was such favoritism, however, for the reasons the Court has attempted to explain, what is missing in this record is any evidence that any alleged favoritism resulted in material disparities that manifested along gender

---

18.)  She also testified that OPS scheduled the fitness test for her and several other agents "to mess with me a little bit." (Crowley Dep. 136:24.)  The test was postponed by ASAIC Watson when Plaintiff informed him that taking it might hinder her physical therapy for a back problem.  (<u>See</u> Crowley Dep. 135:5–11).  Plaintiff has not argued that either of these occurrences amounts to an adverse employment action, nor has she argued that SA Burr's call goes to causation.  In any case, without the benefit of briefing by either party on these issues, the Court confines itself to noting <u>White</u>'s teaching that "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  548 U.S. at 67.  Here, neither incident would seem to meet that threshold.

lines.  In other words, Plaintiff has failed to adduce sufficient evidence to establish a <u>prima facie</u>

case of discrimination and retaliation under Title VII.  Accordingly, Defendant's motion for sum-

mary judgment must be GRANTED.

      The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 42, and

to close this case.

SO ORDERED.

Dated:     March 31, 2015
           New York, New York

                                     Ronnie Abrams
                                     United States District Judge